**IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
NORTHERN DIVISION**

**DAVID E. BELL** **PLAINTIFF**

**V.** **CASE NO.: 1:12CV00011 BD**

**MICHAEL J. ASTRUE, COMMISSIONER,
SOCIAL SECURITY ADMINISTRATION** **DEFENDANT**

## MEMORANDUM OPINION AND ORDER

David E. Bell alleges that he has not been able to work since a July 11, 2007 automobile accident. (Tr. 41) His injuries from the accident included a broken collarbone, ruptured disks in his lower back, a dislocated wrist, and broken ribs resulting in a collapsed lung. (Tr. 41-42) Prior to the July automobile accident, Mr. Bell had three fingers amputated from his right hand after a motorcycle accident and a separate automobile accident had left him with plates in both legs. (Tr. 42, 50)

At the hearing, Mr. Bell described several other accidents which occurred after the July, 2007 automobile accident and that resulted in various injuries including a broken arm, re-injuries to his right leg, a twisted ankle, and a fracture in his back. (Tr. 52-53) Mr. Bell testified to having a non-union fracture in his right leg. (Tr. 53)

Mr. Bell also claimed that he began having seizures shortly after the automobile accident, and that he was taking Valium and Phenoton to control them. (Tr. 42-43) He

testified that he has six to eight seizures per month. (Tr. 45) He said that he could walk 100 yards, stand for 15 or 20 minutes, and lift 20 pounds. (Tr. 49)

***Listed Impairments***

Mr. Bell challenges the ALJ's[1] determination that he did not have an impairment that meets Listings 1.02, 1.04, 1.06, 1.07, and 1.08 under 20 C.F.R. Part 404, Subpart P, Appendix 1. (#10, pp. 12-16) A claimant has the burden of proving that an impairment (or combination of impairments) meets or equals a Listing. *Johnson v. Barnhart*, 390 F.3d 1067, 1070 (8th Cir. 2004). "To meet a listing, an impairment must meet all of the listing's specified criteria." *Carlson v. Astrue*, 604 F.3d 589, 593 (8th Cir. 2010) (citing references omitted).

Here, the ALJ found that Mr. Bell had the following severe impairments: multiple fractures from a motor vehicle accident status post open reduction internal fixation surgery (right wrist fracture/dislocation of the radial styloid with complete dislocation of the carpus; right third metacarpal head fracture; right fifth metacarpal base fracture; multiple right rib fractures; and left clavicular fracture); right distal tibia and fibula fractures status post open reduction internal fixation surgery; lumbosacral spondylosis; thoracic spondylosis; sacroiliac joint dysfunction; lumbar compression fracture; and seizure disorder. (Tr. 12)

[1]The Honorable Harold D. Davis.

The ALJ considered whether Mr. Bell met Listings 1.02 for major dysfunction of a joint due to any cause, 1.04 for disorders of the spine; 1.06 for fracture of the femur, tibia, pelvis or one or more of the tarsal bones; 1.07 for fracture of an upper extremity, and 11.02 for convulsive epilepsy. He concluded that Mr. Bell had not established that he met all of the specific medical criteria to meet any of these Listings. (Tr. 16-17)

As support for his argument that he meets several Listings, Mr. Bell provides a summary of the injuries he has sustained. In his brief, however, he does not address the ALJ's analysis or clarify how he meets the specific requirements of any of these Listings. (#10 at pp. 14-15)

For example, he claims he met Listings 1.02 and 1.06 but has not established that he was unable to ambulate effectively as defined in 1.00B2b. See 20 C.F.R., Part 404, Subpart P, Appendix 1, § 1.02. As the Commissioner notes, the record is replete with references to Mr. Bell's ability to ambulate independently without the use of hand-held assistive devices. Also, absent from the record is any suggestion that Mr. Bell had extreme loss of function in both upper extremities.

Mr. Bell also contends that he met Listings 1.07 and 1.08, but he has not established that he was under continuing surgical management as defined in 1.00M. See 20 C.F.R. Part 404, Subpart P, Appendix 1, §§ 1.07, 1.08.

There is substantial evidence supporting the ALJ's conclusion that Mr. Bell did not meet his burden of establishing that he met a Listed impairment.

***Credibility***

Mr. Bell challenges the ALJ's credibility assessment, maintaining that the ALJ should have given his complaints of pain more weight. (#10 at pp. 15-18) An ALJ has a statutory duty "to assess the credibility of the claimant and other witnesses." *Nelson v. Sullivan*, 966 F.2d 363, 366 (8th Cir. 1992). A reviewing court "will defer to an ALJ's credibility finding as long as the ALJ explicitly discredits a claimant's testimony and gives a good reason for doing so." *Wildman v. Astrue*, 596 F.3d 959, 968 (8th Cir. 2010) (citation omitted). To evaluate Mr. Bell's credibility, the ALJ followed the required two-step process and considered the required factors.[2] See *Policy Interpretation Ruling Titles II & XVI: Evaluation of Symptoms in Disability Claims: Assessing the Credibility of an Individual's Statements*, SSR 96-7p (July 2, 1996). Thus, the question before the court is whether substantial evidence supported the ALJ's credibility evaluation.

In discounting Mr. Bell's credibility, the ALJ concludeded that the medical findings were inconsistent with Mr. Bell's allegations. Inconsistency between the medical evidence and Mr. Bell's allegations was a good reason for discounting Mr. Bell's allegations. See *Partee v. Astrue*, 638 F.3d 860, 865 (8th Cir. 2011); *Dunahoo v. Apfel*,

---

[2]In considering the credibility a claimant's subjective complaints, an ALJ must consider: (1) the claimant's prior work record; (2) observations by third parties and treating and examining physicians relating to such matters as: (a) the claimant's daily activities; (b) the duration, frequency and intensity of the pain; (c) precipitating and aggravating factors; (d) dosage, effectiveness and side effects of medication; and (e) functional restrictions. *Polaski v. Heckler*, 739 F.2d 1320, 1322 (8th Cir. 1984).

241 F.3d 1033, 1038 (8th Cir. 2001); *Polaski v. Heckler*, 739 F.2d 1320, 1322 (8th Cir. 1984). The following substantial evidence supports the ALJ's credibility assessment.

Following the July, 2007, automobile accident, Mr. Bell complained of severe back pain with leg numbness. An MRI of Mr. Bell's spine, however, showed no abnormality.

On February 5, 2008, Mr. Bell went to the emergency room at Fulton County Hospital with reports that he had experienced several seizure-like activities in the last 24 hours. Mr. Bell's family was noted to confirm that Mr. Bell was a very heavy drinker of alcohol, and the symptoms were likely due to alcohol withdraw. (Tr. 236) Mr. Bell was treated with benzodiazepine and did not have any repeat seizure activity after treatment.

Mr. Bell was noted to be non-compliant with hospital rules. (Tr. 237) At discharge, Mr. Bell was instructed to follow up with his primary care physician. Mr. Bell stated that rather than following up with his physician, he would probably just start drinking again. (Tr. 237)

When asked about this incident at his hearing, Mr. Bell denied that he was having alcohol withdrawal symptoms on that date. Interestingly, as support for his statement, he claimed that blood work from the hospital visit showed *no* evidence of alcohol. (Tr. 44) (#10 at p. 7) This is questionable for two reasons. First, if he were having alcohol withdrawal symptoms, one would expect that he would test negative for alcohol. And

second, the hospital records indicate that his physician opted not to test Mr. Bell's ETOH[3] levels, because the test would have been conducted by an outside lab, and they would not have had the results back for several days. (Tr. 236)

From September, 2008, to April, 2009, Mr. Bell was treated by Denise Oldenberg, M.D., a pain specialist. At all of his visits with Dr. Oldenberg, Mr. Bell reported that his pain level with medication was a "3" and without medication was an "8" on a 10-point scale. (Tr. 528, 531, 534, 537, 681-82, 685, 696, 699, 702, 705-06, 712)

In spite of being in the care of a pain specialist, on December 2, 2008, Norton Morgon, M.D., examined Mr. Bell at White River Medical Center for a drug overdose. He had been seen in the ER at Fulton County earlier in the day complaining of knee and ankle pain. He had been discharged with prescriptions for Soma and Darvocet. He took an excessive amount of Soma, Darvocet, Naproxen and possibly Lortab and became unresponsive. (Tr. 663)

On April 22, 2009, Dr. Oldenberg released Mr. Bell for failing to comply with his pain contract. (Tr. 696) Results of a urine screen performed at the visit indicated that Mr. Bell had not been taking any of his prescribed pain medications. Mr. Bell's friend, Debbie Wilson, testified that she quit giving Mr. Bell his pain medication because she

[3]ETOH means Ethyl Alcohol [or Ethanol]. 2 Kristin B. Mallegg, *Acronyms, Initialisms & Abbreviations Dictionary* (46th ed. 2012).

believed Dr. Oldenberg was over-medicating him. Ms. Wilson claimed that when Mr. Bell confronted her about it, she dismissed him as a patient. (Tr. 61)

On August 15, 2009, Mr. Bell had surgery at the University of Arkansas for Medical Sciences ("UAMS") to repair a fractured tibia and fibula. On his third day in the hospital, Mr. Bell refused to go to physical therapy. (Tr. 880) At discharge from the hospital on August 18, 2009, Mr. Bell was advised to ambulate with an assistive device and was given a prescription for acetaminophen-oxycodone for pain. (Tr. 827)

Four days after being discharged from UAMS, Mr. Bell reported to the White River Medical Center ("White River") Emergency Room complaining of right leg/ankle pain and stating that he had run out of oxycodone the day before. (Tr. 898) He denied walking on the leg, but the record noted dirt and debris on the bottom of the right splint; and after removing the splint, the nurse removed two ticks. (Tr. 898, 900) Mr. Bell also reported that he had missed his scheduled follow-up appointment at UAMS. (Tr. 900)

An August 22, 2009 x-ray of Mr. Bell's right leg showed that the bone fragments were "well aligned" and the hardware appeared intact. (Tr. 902) There was "no evidence of bone destruction." (Tr. 902) Mr. Bell was advised to elevate his right leg as often as possible and to be non-weight bearing to reduce the pain and swelling.

On August 24, 2009, Mr. Bell visited the emergency room at White River again complaining of right leg pain. The x-rays taken revealed, "no interval change in the

alignment of the fracture fragments when compared to the study of August 22, 2009." (Tr. 910) Mr. Bell was sent to UAMS with a possible surgical infection.

At UAMS, Mr. Bell denied any symptoms of infection but complained of pain. He admitted that he had not been elevating his leg very often, and his mother reported that he had been moving around on it a lot. (Tr. 733) X-rays of the right leg ten days after surgery indicated that Mr. Bell's hardware was in place with no signs of failure. (Tr. 738-40) He was instructed to elevate his leg as often as possible to reduce pain and swelling and to be non-weight bearing. (Tr. 733) His pain medication was refilled.

On August 28, 2009, Mr. Bell returned to the emergency room at White River asking for pain medication for pain in his right leg. (Tr. 913) Mr. Bell was noted to be full weight bearing. (Tr. 913) On examination, he had no cynosis, clubbing, or edema and normal range of motion. (Tr. 914) He was again told not to walk on his foot and to keep it elevated. He was advised to take Motrin and Tylenol for pain as needed and to follow up with his doctor at UAMS. (Tr. 915)

As the ALJ noted, a January 11, 2010 x-ray of Mr. Bell's right lower extremity revealed "some periosteal reaction seen around the tibial fracture. Fracture lines are still visible." (Tr. 948) Results from an x-ray taken in March, 2010, however, did not reveal fracture lines. The radiologist noted, "[P]rior distal fibular and tibial fracture, which has undergone open reduction and internal fixation. Marked degenerative changes are seen in the hindfoot with no evidence of acute process." (Tr. 994)

Mr. Bell alleged that he was disabled because of right leg and foot pain, but he failed to comply with medical recommendations to be non-weight bearing and to elevate his foot to prevent pain and to permit his leg to heal. Failure to follow a recommended course of treatment weighs against a claimant's credibility. *Wagner v. Astrue*, 499 F.3d 842, 851 (8th Cir. 2007) (citation omitted).

On March 3, 2010, Mr. Bell noted that he had a seizure that morning and reported that he was taking his seizure medication. But a lab report dated June 25, 2010 reflects that Mr. Bell's serum Dilantin level was well below the therapeutic range. (Tr. 19, 999-1000) Mr. Bell's non-compliance weighs against his credibility.

Mr. Bell's activities also support the ALJ's credibility determination. Mr. Bell reported managing his own activities of daily living, including driving himself on errands and to appointments, grocery shopping, handling his money and bills, preparing simple meals and sandwiches, watching television, reading novels, and going outside for walks. (Tr. 48, 159)

The evidence is adequate to support the ALJ's conclusion that Mr. Bell exaggerated his pain and symptoms.

***Treating Physician***

At various points in his brief, Mr. Bell claims that the ALJ should have given more weight to the one-page medical source statement completed by George R. Guntharp, D.O., opining that Mr. Bell was restricted to lifting and carrying less than 10 pounds;

standing less than 2 hours; sitting less than 2 hours; elevating his feet, changing positions frequently, taking frequent rest periods and longer than normal breaks; and was unable to reach, finger, or handle. (Tr. 998) (#10 at pp. 3-6) Inconsistency between the medical evidence and Dr. Guntharp's opinion was good reason for discounting the opinion.[4]

In his brief, Mr. Bell states that Dr. Guntharp has followed him "all these years." However, the record does not support this statement. In January, 2010, Mr. Bell reported to the Fulton County Hospital emergency room that a "Dr. Wright" was his primary care physician. (Tr. 944-45) The record indicates that Dr. Guntharp treated Mr. Bell on only three occasions from September to November, 2010. (Tr. 1004-1009) Based on the record, all of Mr. Bell's visits to Dr. Guntharp occurred after he had completed the medical source statement on April 26, 2010. The ALJ properly discounted Dr. Guntharp's opinion as unsupported by the evidence. (Tr. 20-21) See *Anderson v. Astrue*, 696 F.3d 790, 793 (8th Cir. 2012) (an ALJ may discount or even disregard the opinion of

---

[4]The regulations provide that the ALJ considers all of the following factors in deciding the weight to give to any medical opinion: (1) examining relationship, (2) treating relationship; (3) supportability of the opinion; (4) consistency; (5) specialization; and (6) "any factors [the applicant] or others bring[s] to [the ALJ's] attention." 20 C.F.R. §§ 404.1527(d), 416.927(d). If the ALJ finds "that a treating source's opinion on the issue(s) of the nature and severity of [the applicant's] impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the applicant's] record, [the ALJ] will give it controlling weight." *Id*. at §§ 404.1527(d)(2), 416.927(d)(2); *Wagner v. Astrue*, 499 F.3d 842, 848-49 (8th Cir. 2007)

a treating physician where other medical assessments are supported by better or more thorough medical evidence).

***Non-Union***

Finally, Mr. Bell argues that he suffered from a non-union[5] of his right leg at the time of his hearing and should have been entitled to a closed period of disability. (Tr. 19) This claim is not supported by the evidence.

On August 15, 2009, Mr. Bell fell and fractured his right tibia and fibula. As discussed above, the report from one x-ray of Mr. Bell's lower right leg on January 11, 2010,[6] noted "some periosteal reaction seen around the tibial fracture lines are still visible." (Tr. 948) This is the only indication of possible non-union in the record and is not even labeled such by the radiologist. As noted, other x-rays of Mr. Bell's lower right leg that were taken following surgical repair indicated that the fractures were healing. (Tr. 738-40, 902, 910) And results from an x-ray taken in March, 2010, did not reveal any fracture lines. (Tr. 994)

---

[5]When satisfactory healing of a fracture is not occurring naturally or when the pace of healing is too slow, the condition is called fracture non-union. Tish Davidson, 1 *The Gale Encyclopedia of Med.* 702-03 (4th ed.) It occurs more frequently among adults than children, in people with severe or complex fractures, and in people who smoke and is sometimes treated with bone growth stimulation. *Id.*

[6]Presumably, Mr. Bell's counsel is relying on this x-ray to establish non-union. He does not, however, cite the Court to any evidence in the record to support his claim. (#10 at pp. 13, 17, 19)

There is no support in the medical records for Mr. Bell's contention that he suffered from a non-union of his right leg at the time of his hearing.

***Conclusion***

Substantial evidence supported the ALJ's decision denying Mr. Bell's applications. The ALJ made no legal error. For these reasons, the court DENIES Mr. Bell's request for relief (docket entry # 2) and AFFIRMS the decision denying the application.

DATED this 4th day of February, 2013.

UNITED STATES MAGISTRATE JUDGE